IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| KENNETH RAY JOHNSON,<br><br>         Plaintiff<br><br>VS.<br><br>CURTIS JOHNSON, Warden, *et al.*,<br><br>         Defendants | NO. 5:02-CV-90 (DF)<br><br>PROCEEDINGS UNDER 42 U.S.C. § 1983<br>BEFORE THE U. S. MAGISTRATE JUDGE |

# RECOMMENDATION

Plaintiff KENNETH RAY JOHNSON is an inmate in the custody of the state of Georgia. He has sued defendants CURTIS JOHNSON, WARDEN, DR. KARUNAKER R. SRIPATHI, P.A. PECKHAM, and CHRISTOPHER ROGER, R.N.,[1] alleging that the defendants violated his constitutional rights while he was incarcerated at Wilcox State Prison in Abbeville, Georgia. Plaintiff states that on August 31, 2001, he filed a sick call slip due to a rash on various parts of his body. He was seen on September 4, 2001, and given a cream for his rash. Thereafter, the rash on his eyelid began to spread to his eye. He submitted another sick call on November 1, 2001, and was seen in medical the next day where the nurse placed some drops in his eyes and the physicians assistant (PA) gave him Neosporin. Plaintiff alleges that he had a negative reaction to the drops that caused his eye to swell shut. On November 2, 2001, he had an officer contact medical about his eye. The medical personnel refused to see him because he had not filled out a sick call slip.

On November 5, 2001, defendant Sripathi did examine plaintiff and gave him medication for his eye. Plaintiff claims that the medication did not help and that he was in constant pain. Medical personnel advised plaintiff to continue using the medication. On November 8, 2001, defendant Sripathi sent plaintiff to Augusta State Medical Prison (ASMP) to see a specialist who prescribed additional medication on November 14, 2001. Plaintiff did not receive the medication for two days. Plaintiff claims that his eye is permanently disfigured and that his vision is gradually deteriorating as a result of the delay in medical treatment.

---

[1] Defendants JIM WETHERINGTON, COMMISSIONER, and WILCOX STATE PRISON MEDICAL STAFF were dismissed from this action on February 2, 2003. Tab #6.

Before the court is the defendants' **MOTION FOR SUMMARY JUDGMENT**. Tab #33. The motion is supported by a brief, affidavit, medical records, and deposition. The court advised the plaintiff of said motion and his duty to respond properly thereto. Tab #38. The plaintiff has filed a response to the defendants' motion. Tab #42. In entering this recommendation, the undersigned has carefully considered the defendants' motion and all attachments thereto, as well as the plaintiff's response.

## LEGAL STANDARDS
### A. Summary Judgment

Rule 56 of the *Federal Rules of Civil Procedure* dealing with motions for summary judgment provides as follows:

> The motion shall be served at least 10 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Summary judgment can only be granted if there are no genuine issues of material fact and if the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c); Warrior Tombigbee Transportation Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). While the evidence and all factual inferences therefrom must be viewed by the court in the light most favorable to the party opposing the motion, the party opposing the granting of the motion for summary judgment cannot rest on his pleadings to present an issue of fact but must make a response to the motion by filing affidavits, depositions, or otherwise in order to persuade the court that there are material facts present in the case which must be presented to a jury for resolution. *See Van T. Junkins & Assoc. v. U.S. Industries, Inc.*, 736 F.2d 656, 658 (11th Cir. 1984).

Specifically, the party seeking summary judgment bears the initial burden to demonstrate to the court the basis for its motion by identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show that there is an absence of any genuine issue of material fact. *Hairston v. The Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1998). In determining whether the moving party has met this burden, the court must review the evidence and all factual inferences drawn from this, in the light most favorable to the non-moving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

If the moving party successfully meets this burden, the burden then shifts to the non-moving party to establish by going beyond the pleadings, that there are genuine issues of material fact to be resolved by a fact-finder. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Genuine issues are those as to which the evidence is such that a reasonable jury could find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).[2]

## DISCUSSION
### Deliberate Indifference

In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251, rehearing denied 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1976). However, the course of treatment is "a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107.[3] A mere disagreement between a prisoner and prison officials as to diagnosis or treatment does not give rise to a constitutional violation. *Id*. at 106.

---

[2] *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (the purpose of summary judgment is to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial); *Brown v. City of Clewiston*, 848 F.2d 1534, 1543 (11th Cir. 1988) (the question is whether the record as a whole could lead a rational trier of fact to find for the nonmovant).

[3] At most, a mere allegation of improper or untimely treatment, without more, states a claim of medical malpractice cognizable under state law. *Id. See also Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991) (vacated pursuant to settlement, 931 F.2d 711 (11th Cir. 1991), reinstated by unpublished order (June 24, 1991), cited in *Howell v. Burden*, 12 F.3d 190, 191 n.* (11th Cir. 1994)). Moreover, *Estelle* specifically states that the question of whether an x-ray or additional diagnostic techniques or forms of treatment are indicated are classic examples of matters for medical judgment and that medical malpractice does not become a constitutional violation merely because the patient is a prisoner. 97 S.Ct. at 292-93.

Delay in access to medical attention can violate the Eighth Amendment when it is tantamount to unnecessary and wanton infliction of pain. Cases stating a constitutional claim for immediate or emergency medical attention have concerned medical needs that are obvious even to lay persons because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem. In contrast, delay or even denial of medical treatment for superficial, nonserious physical conditions does not violate the Eighth Amendment. The seriousness of an inmate's medical needs may be decided by reference to the effect of the delay in treatment.

Where the delay results in an inmate's suffering a life-long handicap or permanent loss, the medical need is considered serious. An inmate who complains that delay in medical treatment rose to a constitutional violation must place <u>verifying medical evidence in the record</u> to establish the detrimental effect of delay in medical treatment to succeed. Further, the tolerable length of the delay in providing medical attention depends on the nature of the medical need and the reason for the delay. Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay. *Hill v. Dekalb R.Y.D.C.*, 40 F.3d 1176, (11th Cir.1994) (emphasis added).

In support of their motion for summary judgment, the defendants have submitted the plaintiff's deposition, medical records, and the affidavit of defendant Sripathi. The deposition, records, and affidavit indicate that the defendants were not deliberately indifferent to plaintiff's serious medical needs.

Defendant Sripathi states plaintiff refused to be seen for a rash that was becoming progressively worse on August 14, 2001.  Tab #35, Exhibit 1, pp. 1.

On August 30, 2001, plaintiff was seen by the nurse in medical. He was complaining that "that something flew in my eye on detail." Plaintiff went on to state that initially it burned and that keeping his eye closed made it feel better. He also stated that his vision was clear. It was noted by medical that he had no known drug allergies and that his vision was 20/25 in each eye. He was seen by Dr. Adler that same day who diagnosed plaintiff with "foreign body sensation OD." Dr. Adler also noted that plaintiff had a conjunctival infection in his left eye. He was negative for flourescence test. Follow-up care was discussed and plaintiff was instructed to return to medical if the pain persisted. *Id*. at 3-5.

Plaintiff was next seen in medical on September 4, 2001. He reported that he had a rash on his feet, arms, and eyelid that had been present on and off for about a year. He complained of itching and stated that he had been given creams in the past. Examination showed no signs of a rash or infection. Plaintiff was assessed as having a fungal rash and given tolnaftate cream to apply twice a day. He was also given hydrocortisone cream 1%. He was instructed as to using the creams as directed and on good hand washing techniques. *Id*. at 6.

On September 6, 2001, plaintiff again went to medical for complaints of a rash as well as hemorrhoids. He stated that he had some questions about his rash and the use of the hydrocortisone cream because another doctor told him to stop using the cream after some irritation was noted. Physical findings revealed some patches of psoriasis on his left hand and knuckles, forehead, and ankles. He was diagnosed with psoriasis or psoriasis dermatitis. He was instructed to continue using the hydrocortisone cream and was told that the initial sting and redness was a common reaction when one first started using it. *Id*. at 7.

Plaintiff was again seen at medical on September 16, 2001. He was complaining that his rash was worse. Examination showed no sign of infection. Plaintiff was referred to the doctor and instructed to keep the area clean and dry. However, plaintiff refused to been seen by the doctor because "he kept seeing the same person with no results." *Id*. at 8-10.

On September 27, 2001, plaintiff went to medical and requested to be seen by a dermatologist. No distress was noted. It was further noted that before plaintiff could be seen by the doctor, he "became irate and left hostile- cursing refused to sign refusal." *Id*. at 11-12.

Plaintiff was next seen in medical on October 10, 2001. He complained of a rash on his face, scalp, and scrotum that was very itchy and getting worse. Physical findings only revealed a rash on his face and forehead. A blood count was ordered and he was given Benadryl twice a day, hemorrhoid medication, and an anti-fungal cream. The benefits of mineral oil for the skin were also discussed with plaintiff. *Id*. at 14.

Plaintiff was still complaining of itching due to a rash on October 17, 2001. He was given Selsun shampoo and told to leave it on the affected areas for 10 minutes to one hour for seven days. *Id*. at 15-16.

Plaintiff was placed in disciplinary isolation from October 27, 2001, to October 31, 2001. He was checked on each day for medical problems. He had no complaints, and on October 30, 2001, he stated that he stopped taking some of his medications because he felt better. *Id*. at 17-18.

Plaintiff went to medical on November 2, 2001, for complaints of left eye irritation that was causing redness and burning. He stated that his vision was blurry. His eyes were noted to be red with 20/30 vision in his left eye. He was referred to a higher level medical service provider that day. Plaintiff was give Neosporin and told to apply it to his lower eye lid three times a day for a week and to return to the clinic for a follow-up. He was also instructed to stop scratching and rubbing his eye. *Id*. at 22. Approximately fifteen hours later, plaintiff was again seen in medical for complaints of hemorrhoids. He made no mention of any eye irritation. *Id*. at 23.

Plaintiff was next seen at medical on November 5, 2001, with complaints about his left eye. It was noted that his left lid had minimal swelling on both the upper and lower lid. He was diagnosed as having an allergic reaction to Neosporin. Plaintiff was given Gentamicin Opth eye drops to use twice a day for four days and a Methylpred dose pak. He was also allowed eye protection and taken off work detail for two days. *Id*. at 24-5.

6

Plaintiff had a follow-up medical appointment on November 8, 2001. It was noted that he had been switched to Bentamycin drops and his upper and lower left eye lid were still swollen. A small amount of dried liquid was also noted to be around his eye. The PA stated that plaintiff was "very anxious about his condition" and felt that he was "making it out to be much worse than it is." Plaintiff was given a diagnosis of "probably bacterial conjunctivitis," instructed to continue his medications, and return for a follow-up on the November 12. *Id*. at 26.

Plaintiff was again seen at medical on November 13, 2001. Examination showed no reduction in swelling and the conjunctival infection was increasing. Photosensitvity was also noted. Plaintiff was diagnosed with Blepheritis that was unresponsive to conventional care. An urgent ophthalmology consult was submitted by the nurse and defendant Sripathi and Utilization Management approved it that same day. Plaintiff was given a protective eye patch to help with sensitivity and follow-up care was discussed. *Id*. at 27-9.

Plaintiff was sent to ASMP for treatment on November 14, 200l. Dr. McCleod noted some lichenfication of skin around the left periocular area. However, plaintiff's cornea was noted as clear. Dr. McCleod stated that the infection was "all residual allergic reaction to the Neomycin in Neosporin." Plaintiff was prescribed Prednisone to take three or four times a day for four or five days and he was given Kenalog cream to put on the skin around his left periocular area three times a day for four or five days. *Id*. at 30-32.

The PA turned the plaintiff's prescription from Dr. McCleod in on November 15, 2001. The prescription was filled and plaintiff was given his medication the next day. *Id*. at 33.

In response to the defendants' motion, the plaintiff has submitted nothing of substance to adequately rebut the defendants showing that he was provided with constitutionally adequate medical care. Significantly, plaintiff has failed to submit any medical evidence in support of his contention that any delay in receiving his treatment and medication fell below applicable medical standards and constitutionally adequate standards of care. He simply disagrees with the defendants treatment for his eye condition.

In the court's view, plaintiff JOHNSON has failed to establish the defendants' deliberate indifference to his medical needs, serious or otherwise. He has submitted no medical evidence to support his contention that the defendants were deliberately indifferent in treating his eye condition. The record is replete with indications that treatment for his eye condition has been afforded the plaintiff on numerous occasions.

Accordingly, IT IS RECOMMENDED that the defendants' MOTION FOR SUMMARY JUDGMENT (Tab #33) be **GRANTED**. Pursuant to 28 U.S.C. §636(b)(1), the parties may serve and file written objections to this **RECOMMENDATION** with the district judge to whom this case is assigned, **WITHIN TEN (10) DAYS** after being served with a copy thereof.

SO RECOMMENDED, this 24th day of FEBRUARY, 2004.



CLAUDE W. HICKS, JR.
UNITED STATES MAGISTRATE JUDGE